IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:09-CT-3111-BO

| | |
|---|---|
| ROBERT ROYSTER,<br>    Plaintiff, | )<br>)<br>) |
| v. | )    O R D E R<br>) |
| DETECTIVE P. MCKEON, et al.,<br>    Defendants. | )<br>) |

Plaintiff filed this action while in custody of the Wake County Detention Center pursuant to 42 U.S.C. § 1983. Since the time of filing, he has been released from incarceration. Presently before the court are 5 pending motions: plaintiff's motion for appointment of counsel (D.E. # 31), defendants' motion for summary judgment (D.E. # 34), defendants' motion to take deposition of plaintiff (D.E. # 40), defendants' motion to compel (D.E. # 41), and plaintiff's motion for medical records (D.E. # 44). Because summary judgment is appropriate in this matter and concludes the case, the court shall review this motion first. The remaining motions shall be dismissed as moot.

## ISSUES

Plaintiff filed this action against four Raleigh Police Detectives, McKeon, Patchin, Faulcon, and Gibney involved in his criminal prosecution. (Complaint, ¶III.) Plaintiff claims that on January 17, 2008, these detectives used excessive force during his physical arrest at 715 S. Boylan Avenue in Raleigh. Plaintiff asserts claims under the Fourth Amendment and for assault and battery under North Carolina law. He seeks $500,000 in compensatory damages, jointly and severally, and $100,000 in punitive damages from each officer. (Complaint, ¶V.)

## FACTUAL DISCUSSION

Prior to the date of the event in question, the Raleigh Police Department ("RPD") received complaints about alleged illegal drug activities at 715 S. Boylan Avenue in Raleigh and police were assigned to investigate. (McKeon Decl., ¶2). As a part of the investigation, Detectives McKeon and Faulcon sent an informant to make controlled purchases of crack cocaine at the Boylan address. (McKeon Decl., ¶3; Faulcon Decl., ¶3). The informant purchased crack cocaine from plaintiff on five different dates: January 3, 8, 9, 10 and 17, 2008. (McKeon Decl., ¶3). Police officials decided they would arrest plaintiff on January 17, 2009, after the planned drug buy. (McKeon Decl., ¶4).

Detective McKeon obtained warrants and arranged to take plaintiff into custody. Several police officers were present at 715 S. Boylan Avenue on January 17, 2008, including Detectives McKeon, Patchin, and Gibney. (McKeon Decl., ¶4). Detective Faulcon was not involved in the drug buy or the arrest that occurred on January 17, 2008. (Faulcon Decl., ¶2).

The detectives knew plaintiff had a long history of selling crack cocaine. (McKeon Decl., ¶5; Gibney Decl., ¶2; Patchin Decl., ¶2). They knew that drug dealers often carried guns on their person or had guns hidden near the location from which they sold their contraband. (Id.). They knew plaintiff's criminal record included several convictions for Resisting, Obstructing or Delaying an Officer. The detectives also knew plaintiff had previously been arrested for numerous cocaine-related felonies and convicted of at least one aggravated assault. (McKeon Decl., ¶5). They knew plaintiff's nickname "Tuffy" and that he was known "on the street" for fighting. (Id.). The confidential informant making the drug buys warned Detective McKeon that he needed to be careful when arresting plaintiff because plaintiff would fight. (Id.). Detective

2

McKeon also knew that at least one of plaintiff's relatives who frequented 715 S. Boylan Avenue was a gang member. (Id.).

On January 17, 2008, the informant made his last controlled drug buy from plaintiff in the back yard of 715 S. Boylan Avenue. At the time, plaintiff was apparently residing in a storage shed at the back of the property. (McKeon Decl., ¶¶4, 6; Patchin Decl., ¶4). After the buy, Detectives McKeon, Patchin, and Gibney, other RPD detectives, and members of the RPD Gang Suppression Unit entered the back yard at 715 S. Boylan.(McKeon Decl., ¶7). Detectives Patchin and Gibney entered the property from the right side of the house while Detective McKeon entered from the left. (McKeon Decl., ¶7; Patchin Decl., ¶3; Gibney Decl., ¶3). The RPD officers involved in the arrest wore clothing which identified them as police officers. (McKeon Decl., ¶8; Patchin Decl., ¶3; Gibney Decl., ¶4). Detective McKeon and other officers stated "Police, get down!" (McKeon Decl., ¶9; Patchin Decl., ¶3; Gibney Decl., ¶4). The complaint indicates that plaintiff responded to these commands by attempting to leave the back yard and enter the house. (Complaint, ¶IV).

The officers brought plaintiff to the ground. The officers pulled plaintiff's arms to his back and handcuffed him. (McKeon Decl., ¶10). Detective McKeon service weapon, which was at the low ready position as he approached the back yard, was holstered once plaintiff was secured. (McKeon Decl., ¶ 14.) Detectives Patchin and Gibney had no direct contact with plaintiff.

Detective Patchin had his gun at the low-ready position, but never pointed it at anyone. He holstered his weapon once the area was secure. (Patchin Decl., ¶¶3, 5.) Detective Gibney kept his weapon holstered at all times. (Gibney Decl., ¶4.) Detectives Patchin and Gibney were not

3

involved in plaintiff's physical arrest. (Patchin Decl., ¶7; Gibney Decl., ¶6). They did see plaintiff after he was handcuffed and contend no police officer use force against him. (Patchin Decl., ¶¶8-9; Gibney Decl., ¶6).

After advising him of his Miranda warnings and receiving an oral waiver, Detective McKeon interviewed plaintiff. (McKeon Decl., ¶17). At the end of the interview, plaintiff was taken to the Wake County Jail and booked. None of the officers involved in the arrest heard plaintiff request medical care. (McKeon Decl., ¶19; Gibney Decl., ¶6; Patchin Decl., ¶10.) Plaintiff had no observable bump, bruise, cut or scrape after the arrest. (McKeon Decl., ¶19).

Plaintiff characterizes his injuries as a neck injury from which he still suffers pain and wear a collar at times. (Plaintiff's answer to interrogatory 12). Plaintiff attached a medical record to his answers showing that the N.C. Department of Corrections had issued a cervical collar to him on March 11, 2009. He also attached documents from the Wake County Sheriff's Office showing that he had seen a physician on June 3, 2008, June 17, 2008, July 31, 2008, and August 26, 2008.

Jail records show that plaintiff was in the Sheriff's custody continuously from January 17, 2008 until February 11, 2009. (See Wake County Sheriff's Department's response to Defendants' subpoena, p. 8). Plaintiff's medical records show no report of injuries on January 17, 2008. In an August 16, 2008, physician's note this is stated: 48 year old male with pain/numbness to right hand secondary to tight handcuff while being arrested 1-17-08. (Id. at p. 16). Note, too, that Plaintiff fractured his right arm in 2002 and briefly complained of handcuff-related pain at that time. (Id. at pp. 18-19).

4

Case 5:09-ct-03111-BO   Document 55   Filed 08/16/11   Page 4 of 7

## LEGAL DISCUSSION

Summary judgment is appropriate when there exists no genuine issue of any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Id. at 250. Furthermore, although the court is required to draw any inferences from the underlying facts which are favorable to the nonmovant, inferences may be drawn only from facts for which the nonmovant offers Rule 56 proof (rather than mere allegations); and must be reasonable in light of competing inferences to the contrary. See Sylvia Development Corp. v. Calvert County, 48 F.3d 810, 817-18 (4th Cir. 1995).

i.  Fourth Amendment

Royster is alleging excessive force arising from his arrest on January 17, 2008. At that time, Royster was neither a prisoner nor pre-trial detainee. Therefore under the Supreme Court's ruling in Graham v. Connor, we must review Royster's excessive force claim under the Fourth Amendment and its "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395 (1989) (holding that "*all* claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). As the Court stated in Graham, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985) (internal

5

quotation marks omitted)). Because such a test does not lend itself to a bright line rule, the court must take into consideration the "totality of the circumstances" when assessing the reasonableness of force used by an officer. Garner, 471 U.S. at 8-9. In doing so, one is to view the totality of the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. "The extent of the plaintiff's injury is also a relevant consideration." Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).

To begin, plaintiff pled guilty to three felonies as a result of the events on January 10, 2008. In assessing the use of force used in plaintiff's arrest on that day, the court looks at the totality of the circumstances. First, the officers knew plaintiff had a long criminal history. They knew his propensity for aggression and that his nickname was "Tuffy." They also knew the area in which he was located was frequented by a gang member. The officers knew that drug purchases and gang member often carry weapons. The situation as it presented itself, was unstable and dangerous. Several of the officers had their weapons drawn as they approached. An arrest of plaintiff occurred and as plaintiff describes the use of force, "officers had guns in their possession, one officer put a knee on his back, a knee on his neck, and someone bent his arm. The record shows, plaintiff never requested medical attention from the arrest. The use of force was reasonable given the totality of the circumstances and the Fourth Amendment claims are dismissed.

ii.  State Law Claims

As for the state law claims, under North Carolina law, a police officer is entitled to use force to make an arrest "to the extent that he reasonably believes it necessary . . . to effect an arrest of a person who he reasonably believes has committed a criminal offense, or [t]o defend

6

himself or a third person from what he reasonably believes to be the use or imminent use of physical force while effecting or attempting to effect an arrest." N.C. Gen. Stat. § 15A-401(d). In a lawful arrest, he "has the right to use reasonable force to subdue the arrestee and the arrestee has no right to resist." State v. Burton, 108 N.C. App. 219, 226, 423 S.E.2d 484, 488 (1992), disc. review denied, 333 N.C. 576, 429 S.E.2d 574 (1993). Only when there is "substantial evidence of unusual force" will a civil action lie. Myrick v. Cooley, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496, disc. review denied, 323 N.C. 477, 373 S.E.2d 865 (1988). No such evidence of unusual force is present. The force described by plaintiff himself in his interrogatory answers is minimal. Neither is there any support of use of more than reasonable force from the situation as it presented itself along with the lack of recorded injuries within the medical records.

## CONCLUSION

Accordingly, defendants' motion for summary judgment is GRANTED and the case is DISMISSED (D.E. # 34). Having so determined, all other pending motions are DENIED as MOOT (D.E. # 31, 40, 41, and 44)

SO ORDERED, this the _14_ day of August 2011.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE